**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **MSTG, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 7411 |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| **AT&T MOBILITY LLC**, | ) | Magistrate Judge |
| | ) |   Martin C. Ashman |
| Defendant. | ) | |


## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant AT&T Mobility LLC's ("AT&T") Motion to Compel

Plaintiff MSTG, Inc. ("MSTG") to produce various documents that MSTG argues are protected

by the attorney-client privilege and the work product doctrine, or are otherwise irrelevant to the

issues at stake in this case. The Court rules on this motion under District Judge David H. Coar's

referral for a decision pursuant to N.D. Ill. Rule 72.1.[1] Based on the parties' briefs and a hearing

on the motion, the Court finds that AT&T's motion is granted in part and denied in part.


## I.   Background

MSTG is a South Korean corporation involved in developing and licensing property

rights associated with wireless telecommunications networks. MSTG owns the rights, title, and

interests in three patents that it alleges AT&T, as well as a number of other defendants who are

---

[1] Judge Coar subsequently retired after issuing the referral of this motion. On January 7, 2011, the Northern District of Illinois' Executive Committee reassigned this case to United States District Judge Edmond E. Chang.

not parties to this motion, have infringed under the patent laws of the United States, 35 U.S.C.

§ 1 *et seq.* These include United States Patent Nos. 5,920,551 ("the '551 patent"), 6,198,936

("the '936 patent"), and 6,438,113 ("the '113 patent"). All three patents involve technologies that

are used in third-generation mobile telecommunications. According to MSTG, the technologies

and inventions covered by these patents were originally developed by the Electronics and

Telecommunications Research Institute ("ETRI"), a government-funded research organization

established by the Republic of Korea. At some point not specified by the Second Amended

Complaint, MSTG acquired the rights to the '551 patent, the '936 patent, and the '113 patent and

subsequently brought this patent-infringement suit against AT&T and other companies involved

in mobile telecommunications. MSTG alleges that AT&T has infringed its patents through the

types of services it offers over the AT&T networks and by selling a variety of handset devices.

On August 25, 2009, AT&T sent its first requests for production to MSTG. AT&T's

discovery included a request for MSTG's "business plans, projections, forecasts, market and

industry analyses" and other documents related to MSTG's business operations. (Def's. Mot.,

Ex. A at 7.) In response, MSTG produced a ninety-four page document that included two

business plans, one arranged by months and the other by years ("the business plans"). The Court

does not describe the plans in detail because MSTG filed them under seal and provided a copy to

the Court for *in camera* review. Nevertheless, the business plans identify a number of other

documents that AT&T determined upon review were responsive to its request but which MSTG

did not produce. AT&T asked MSTG to provide copies of these additional documents but

received in return a demand by MSTG to return the plans pursuant to the parties' protective order

that included a clawback provision for inadvertently produced documents. AT&T returned the business plans but now seeks to compel their production.

AT&T also claims that MSTG produced license agreements between itself and a number of third parties concerning the licensing of the three patents at issue in this lawsuit. Neither party has specifically identified the agreements, but the Court's review of the exhibits attached to the parties' briefs shows at least three licenses: (1) an April 28, 2009 agreement with Nokia Corp., (2) a July 9, 2010 agreement with RPX Corp., and (3) an April 15, 2010 agreement with Motorola Corp. AT&T seeks the production of documents reflecting communications between the parties about these licenses, including settlement negotiations, claiming that they are relevant to calculating the value of a reasonable royalty in this matter.

## II. <u>Legal Standard</u>

A party may file a motion to compel under Fed. R. Civ. P. 37 whenever another party fails to respond to a discovery request or when its response is insufficient. Fed. R. Civ. P. 37(a). Courts have broad discretion in resolving such disputes and do so by adopting a liberal interpretation of the discovery rules. *Wilstein v. San Tropai Condo. Master Assoc*., 189 F.R.D. 371, 375 (N.D. Ill. 1999). Federal Rule of Civil Procedure 26(b)(1) provides that the "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Discoverable information is not limited to evidence admissible at trial. Instead, such information is relevant "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

The attorney-client privilege promotes open discussions between attorneys and their clients by preventing the disclosure of certain kinds of attorney-client communications. *Upjohn v. United States*, 449 U.S. 383, 389 (1981). The Seventh Circuit has adopted eight principles that define the existence and scope of the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991) (internal quote and citation omitted). Only communications that are made for the purpose of obtaining legal advice are protected by the attorney-client privilege. *Matter of Grand Jury Proceeding, Cherney*, 898 F.2d 565, 567 (7th Cir. 1990). When the parties involve an organization with in-house counsel, communications between the general counsel and an organizational employee are protected only when the employee is seeking legal advice on behalf of the entity itself. *See Upjohn*, 449 U.S. at 394; *Banks v. Office of Senate Sergeant-at-Arms*, 241 F.R.D. 376, 382 (D.D.C. 2007).

The work product doctrine protects documents that an attorney or a representative of a party prepares in anticipation of litigation in order to prepare or analyze a client's case. Fed. R. Civ. P. 26(b)(3); *Sandra T.E. v. South Berwyn Sch Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). Its protection is "distinct from and broader than the attorney-client privilege." *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975) (citation omitted). A lawsuit need not be underway for the doctrine to apply "provided the prospect of litigation [is] not remote." *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 768 (7th Cir. 2006). This protection only prevents the disclosure of protected documents or communications, however, not the underlying

facts. *See Upjohn*, 449 U.S. at 395-96. The party asserting either privilege has the burden of showing all of its elements. *United States v. BDO Seidman*, 337 F.3d 802, 811 (7th Cir. 2003).

### III. <u>Discussion</u>

As noted, AT&T seeks the production of MSTG's business plans, which MSTG initially produced but then clawed back pursuant to a protective order between the parties. AT&T also asks that MSTG be required to produce a variety of documents mentioned in the business plans that it claims are relevant to the patents at issue in this case. Finally, AT&T wants MSTG to turn over documents reflecting communications between MSTG and the third parties with whom it has entered into license agreements that cover the patents-in-suit.

### A. **The Business Plans**

MSTG's business plans comprise ninety-four pages that include weekly plans from February 13, 2008 through March 23, 2009, as well as yearly plans dated June 26 and 29, 2009. (Pl's. Resp. at Ex. A.) The weekly plans essentially list MSTG officers such as its Chief Executive Officer and Chief Financial Officer by name and briefly identify in summary form certain tasks to be accomplished in the week in question by each officer, as well as tasks poised for resolution the following week. These tasks include a variety of goals that range from the routine (*e.g.* "prepare conference call") to the technical (*e.g.* "analyze patent"). The yearly plans include the same material, this time arranged by months rather than by weeks. According to MSTG, the business plans are not discoverable because they are protected by the attorney-client privilege and the work product doctrine.

In support of this claim, MSTG first argues that both privileges apply to the business plans by virtue of the nature of MSTG's business itself. MSTG acquires patents and then enforces them through litigation, the company contends, and it therefore necessarily created the business plans as part of its ongoing litigation activity. "That is, everything MSTG has done since before the 'business plan' document was created has been done in anticipation of litigation or licensing efforts" and was "performed at the direction of legal counsel[.]" (Pl's. Resp. at 4.) This is an astonishing claim that contravenes the principles that guide the application of privileges. One of the effects of finding that the attorney-client privilege applies in a case is that relevant information is almost always withheld from the opposing party. *See BDO Seidman*, 337 F.3d at 810-11. As such, the Seventh Circuit has been very clear that it should be applied "only where necessary," *id.*, and is "intended to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *United States v. Weger*, 709 F.2d 1151, 1154 (7th Cir. 1983) (internal quote and citation omitted).

Under MSTG's scenario, however, the company would be protected from providing any business-related documents through discovery because, Midas-like, everything related to MSTG's operations would automatically be transformed into protected information. MSTG could go about its business of litigating patents free from the full burdens of discovery, all the while forcing the parties it sues to comply with the ordinary obligations imposed by the Federal Rules of Civil Procedure. The result would be a kind of discovery-related immunity under which the question of whether privileges apply to MSTG's business documents would rarely, if ever, arise in a meaningful way. Contrary to clearly-established law, MSTG would be able to assert broad claims of immunity like the one here without having to demonstrate how each

specific document is protected by the attorney-client privilege or the work product doctrine. *See Schachar v. Am. Acad. of Ophthalomology, Inc.*, 106 F.R.D. 187, 191 (N.D. Ill. 1985) ("The party claiming the privilege has the burden of showing the specific facts giving rise to the privilege; blanket claims of privilege are improper."). In the absence of any case authority by MSTG supporting such an expansion of the scope of privileges, the Court finds this argument unpersuasive.

Setting aside MSTG's initial claim, the Court turns to the business plans themselves. The plans contain approximately four thousand separate entries that briefly describe a task or job activity. MSTG has highlighted several hundred of these which it claims are privileged because they "clearly implicate the attorney-client privilege or the work product immunity." (Pl's. Resp. at 3.) This argument overlooks that even if the entries contained such self-evident signs of being privileged, MSTG still has the burden of demonstrating that they meet the standards required for the privileges it relies on. "[M]ere conclusory statements will not suffice to meet that burden." *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 139 (N.D. Ill. 1993).

MSTG, however, only specifically cites two of the business plans' entries in its response: (1) "prepare claim chart per version" and (2) "small entity issue f[ollow]-u[p]." (MSTG000486 and MSTG000492.) The company presents no argument as to why these entries are protected by the attorney-client privilege or the work product doctrine, and the entries themselves give no indication that either privilege applies. On their face, the entries MSTG quotes do not identify a specific claim chart or the patent litigation related to the claim, nor do they link the "small entity issue" to any attorney-client communication. Moreover, the entries do not demonstrate, and MSTG does not argue, that legal advice was sought from an attorney, that these cites involve

communications related to such advice, or that they were made in confidence. *See White*, 950

F.2d at 430 (explaining that all three elements are essential to finding the attorney-client

privilege).

MSTG argues in a broad manner that all the entries in the business plans were created in

anticipation of litigation. (Pl's. Resp. at 1.) As before, however, such a conclusory claim

unsupported by explanations concerning specific entries is insufficient to show that the work

product doctrine applies. The record suggests that the business plans do not involve legal advice

or attorney communications because MSTG's Rule 30(b)(6) witness testified that the plans were

internal documents created by the company's Chief Financial Officer, Mr. Kanno Song, in order

to distinguish job assignments at MSTG. (Def's. Mot., Ex. D at 66-69.) Documents prepared as

part of a party's regular course of business fall outside the scope of the privilege. *Allendale Mut.*

*Ins. Co. v. Bull Data Systems, Inc*., 145 F.R.D. 84, 87 (N.D. Ill. 1992). Here, MSTG has not

shown how the thousands of items in the business plans were specifically created to address the

instant suit or any other patent infringement case in which MSTG was involved. The fact that

the plans were created by a non-attorney does not in itself defeat a work product claim because

items that are prepared by a party's representative can be protected, but the party asserting the

privilege must still demonstrate that the documents were created because litigation was on the

horizon. MSTG, however, does not explain how Mr. Song created the plans or in what specific

way their creation was motivated by the anticipation of litigation.

Instead, MSTG cites three unpublished cases to support its privilege argument. Relying

on *LaSalle Bank N.A. v. Mobile Hotel Props., LLC*, No. A 03-2225, 2004 WL 902169 (E.D. La.

April 23, 2004), *Fair Isaac Corp. v. Texas Mut. Ins. Co*., No. H-05-3007, 2006 WL 3484283

(S.D. Tex. Nov. 30, 2006), and *EEOC v. Woodmen of the World Life Ins. Soc'y*,

No. 8:03 CV 165, 2007 WL 1544772 (D. Neb. March 23, 2007), MSTG argues that other courts

have protected documents that are similar to its business plans. These cases, however, provide no

support for MSTG's privilege claims.  In *LaSalle Bank*, for example, the owner of a foreclosed

property sought production of the business plans of a credit committee that specialized in

handling defaulted loans.  *LaSalle Bank*, 2004 WL 902169, at *7; *see also LaSalle Bank Nat.*

*Ass'n v. Lehman Bros. Holdings*, 209 F.R.D. 112, 114 (D. Md. 2002) (explaining the function of

the credit committee at issue).  The court found that the work product doctrine protected the

business plans because they were prepared after the default occurred, contained specific

strategies related to the foreclosure in suit, and assessed the plaintiff's rights under the loan

documents.  *Id*.  By contrast, MSTG has failed to connect the entries in its business plans to any

specific lawsuit, to the patents at issue in this case, or to any legal strategy related to AT&T or

another defendant in this case.  As the Court made clear at the hearing on AT&T's motion, the

burden for showing such matters lies entirely with MSTG, and conclusory allegations that are

not supported by specific facts are insufficient to do so.  *Allendale Mut. Ins. Co.*, 152 F.R.D. at

139.

    Privileges, of course, are not absolute and can be waived by a party.  *See Dellwood*

*Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126 (7th Cir. 1997) ("Still, a privilege can be

waived and, once waived, is lost.").  MSTG appears to interpret AT&T's motion as arguing that

MSTG waived any privilege that may have protected its business plans.[2]  In response, MSTG

---

[2] Inadvertent disclosure can result in a waiver of privileges under some conditions,
*Dellwood Farms*, 128 F.2d at 1127, but AT&T's motion does not contend that is the case here.

(continued...)

argues that it has not waived any privilege that attaches to the business plans because it only

provided the plans to its five key officers, and no person outside this "control group" had access

to them. This waiver argument would be misplaced even if MSTG's business plans were

privileged. Although Illinois state law uses the "control group" test to determine whether the

attorney-client privilege applies, *Caremark, Inc. v. Affiliated Computer Services, Inc.*, 192

F.R.D. 263, 265 (N.D. Ill. 2000), this case has been brought pursuant to federal patent law.

Federal courts are not bound to apply state-law privileges where federal law supplies the rule of

decision. *See Mem. Hosp. for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981).

The control group test has not determined the existence of the attorney-client privilege in federal

courts since the Supreme Court rejected that test in 1981. *See Upjohn*, 449 U.S. at 392.

Accordingly, the Court finds that MSTG has not carried its burden of proof to show that

its business plans are protected by either the attorney-client privilege or the work product

doctrine. The motion to compel is granted on this point, and MSTG shall produce the business

plans in their entirety to AT&T within fourteen days of the entry of this order.

### B. Documents Identified in the Business Plans

In its earlier review of the business plans, AT&T noted that they referred to a variety of

other documents that AT&T believed were responsive to its requests for production. For

---

[2](...continued)
In its opening brief, AT&T only claims that MSTG incorrectly clawed back the business plans
on the ground that no privilege applied to them in the first instance, not that MSTG waived a
privilege by doing so. (Def's. Mot. at 3.) AT&T states a waiver claim in its reply brief, but
courts do not consider arguments that are asserted for the first time in a reply. *United States v.
Hughes*, 970 F.2d 227, 235 n.6 (7th Cir. 1992).

example, the business plans include multiple entries concerning a "claim chart" and other specific documentary evidence such as "technology seminar material about owned patents." (MSTG000429.) AT&T asks the Court to compel MSTG to produce documents referred to in the business plans that are responsive to its requests and singles out eight specific categories mentioned in the plans: (1) technology seminar material; (2) a claim letter; (3) inventor information; (4) an invention report; (5) shareholder reports; (6) a shareholder business presentation; (7) market research; and, (8) documents referring to the ETRI small entity issue. (Def's. Mot. at 4-5.) AT&T's request appears to require a straight forward, albeit somewhat involved, privilege analysis of documents that MSTG alleges are protected from discovery. Closer review of the parties' briefs and exhibits, however, reveals a quite different scenario. Both parties have presented arguments and evidence that complicate the task at hand, and the Court must begin by assessing what is at issue here before it can address the merits of the instant motion.

As an initial matter, AT&T has not clearly stated what it seeks to have MSTG produce in this case. MSTG's business plans contain thousands of separate entries, including a number of references to some of the items AT&T mentions such as claim letters or technology seminars. Nevertheless, AT&T has not directed the Court's attention to any specific entries in the business plans that refer to these items, thereby leaving the Court unable to determine with any precision what documents AT&T wants MSTG to turn over. AT&T's generalized request for "any document disclosed in the Business Plan Documents that is responsive to AT&T's document request," (Def's. Mot. at 5), is even less satisfactory because it essentially shifts to the Court the burden of determining what is and is not responsive to AT&T's requests.

The burden in a motion to compel rests with the party seeking discovery to explain why the opposing party's responses are inadequate. *Whitlow v. Martin*, 259 F.R.D. 349, 356 (C.D. Ill. 2009). The Court sees no reason why the same burden should not be on AT&T to specify what it is asking MSTG to produce among the voluminous entries in MSTG's business plans. AT&T claims that it had the opportunity to review MSTG's business plans and to identify documents referred to in those plans that AT&T believes are relevant to its production requests. As such, AT&T should clearly state what they are so that the Court can have an adequate opportunity to review its specific claims. *See ICE Corp. v. Hamilton Sundstrand Corp.*, No. 05-4235, 2007 WL 4239453, at *4 (D. Kan. Nov. 30, 2007) (refusing to compel production when a motion fails to identify the specific documents it seeks). As its stands, however, the Court can only guess at what is included in AT&T's demand for "any" relevant documents.

Accordingly, the Court limits the scope of AT&T's motion to a request for documents that involve the eight categories of information it specifically mentions: (1) technology seminar material; (2) claim letters; (3) inventor information; (4) an invention report; (5) shareholder reports; (6) a shareholder business presentation; (7) market research; and, (8) documents referring to the ETRI small entity issue. (Def's. Mot. at 4-5.) As noted below, MSTG's response allows the Court to determine for itself what documents in the business plans both fall within these eight categories and are claimed as privileged by MSTG.

For its own part, MSTG has failed to comply fully with Fed. R. Civ. P. 26(b)(5). That rule states that when a party withholds discoverable information based on a privilege claim, it is required: (1) to expressly make the claim and (2) do so by describing the documents "in a manner that, without revealing information itself privileged or protected, will enable other

parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A).  In other words, the party must provide

a privilege log.  *See Gardner v. Johnson*, No. 08 C 50006, 2009 WL 5215589, at *3 (N.D. Ill.

Dec. 30, 2009) ("Without a privilege log . . . [t]he court cannot weigh the importance of the

privilege.").

      MSTG, however, has presented no evidence that it did so after asserting the

attorney-client privilege and the work product doctrine in its response to AT&T's discovery

requests.  The company also failed to supply a proper privilege log in response to the motion to

compel, providing instead a complete copy of the business plans for *in camera* review with

several hundred entries singled out as privileged.  These include such items as "analyze rights"

and "review file history" that give no indication of what specific activities were involved or how

a privilege might apply to them.  (MSTG000428).  MSTG also failed to state whether it was

asserting the attorney-client privilege, the work product doctrine, or both, for any of the specific

entries in the business plans that it claims are privileged.

      The Court noted at the hearing that MSTG's document failed to meet the standard for a

privilege log and ordered MSTG to clarify the matter by stating, among other things, what

activities each of the hundreds of entries include, the lawsuits they concern, and when MSTG

decided to initiate those suits.  MSTG has subsequently submitted what it terms a "redaction log"

that expands to some degree the explanation of the activities and documents it claims are

privileged.  The redaction log contains 216 entries that MSTG alleges are privileged.  This

reduces by several hundred the number of privilege claims raised in MSTG's original

submission, but like that earlier document the redaction log again fails to state what privilege is

asserted for each of the 216 entries.  Instead, MSTG only states that those communications

referenced in the log that do involve work product relate to specific infringement suits that MSTG has filed.  In the absence of the specific privilege claims it requested, the Court can only return to MSTG's claim in its response brief that the documents referred to in the business plans "are clearly protected by the attorney-client privilege and/or doctrine [sic] of work-product immunity."  (Pl's. Resp. at 7.)  It has long been the rule in this Circuit, however, that such broad privilege claims are clearly improper.  *See*, *e.g.*, *Federal Trade Comm'n v. Shaffner*, 626 F.2d 32, 37 (7th Cir. 1980); *Schachar*, 106 F.R.D. at 191.  The phrasing of MSTG's claim makes clear the problems that ensue when a party fails to assert privileges on a document-by-document basis. MSTG's reliance on the phrase "and/or" in this context necessarily means that each specific privilege could apply to all 216 entries in its redaction log, only some of them, or none at all. Even if the Court overlooked the fact that MSTG does not assert privilege on a document-by-document basis, therefore, it would still have no idea which privilege MSTG relies on for any entry in the redaction log.

The redaction log also omits any reference to the individual MSTG officers who undertook the tasks described in the 216 entries, making a privilege analysis of the entries impossible by working from the log itself.  The Court can retrieve this information by cross-referencing the redaction log with the thousands of entries included in MSTG's initial submission, but the limitation of AT&T's motion to the eight categories of information discussed above makes this herculean task unnecessary.  A thorough review of the redaction log shows that only seven entries overlap with those eight categories:[3]

---

[3]  The redaction log states that MSTG now waives privilege claims it asserted earlier for categories such as a technology seminar referenced in MSTG000474 or a "US patent seminar"

(continued...)

1. "Proceed internal seminar regarding U.S. litigation." MSTG000478, a July 14, 2008 task assigned to Chief Legal Officer Kangbong Lee.

2. "Seminar about US litigation." MSTG000479, a July 21, 2008 task assigned to no specific individual.

3. "Send marketing research to Niro [MSTG's current litigation counsel]." MSTG000479, a July 21, 2008 task assigned to Chief Legal Officer Lee.

4. "ETRI small entity F-U [follow up]." MSTG000492, a July 21, 2008 task also assigned to Lee.

5. "ETRI small entity issue F-U." MSTG000507, a February 2, 2009 task given to Lee.

6. "Send inventor related info to Niro." MSTG000479, a July 21, 2008 task assigned to Chief Technical Officer Sooyoung Chang.

7. "Prepare material requested by Niro . . . [including the] shareholder report." MSTG000513, a March 16, 2009 task given to the Chief Legal Officer.

The Court, therefore, turns its attention to these seven items that are both relevant to AT&T's requests and alleged to be privileged by MSTG.

Doing so, however, quickly reveals another problem with MSTG's redaction log. "A privilege log must describe the nature of the documents or communications not produced in a manner that, without revealing any potentially privileged information, will enable the other parties to assess the claim." *Babych v. Psychiatric Solutions, Inc.*, — F.R.D. —, No. 09 C 8000, 2010 WL 5128355, at *3 (N.D. Ill. 2010 Dec. 15, 2010). In this case, MSTG's redaction log fails to provide any meaningful information that would allow either AT&T or the Court to determine

---

[3](...continued)
listed in MSTG000474.

if a privilege could apply to items 1-7 listed above. Virtually all of the 216 entries in the redaction log are described by one of a small handful of formulaic descriptions that are repeated for each item with only minor variations. Items 1-3, for example, all contain the same description used for many other entries in the log: "Questions and analysis regarding decisions to hire legal counsel and law firm to initiate and conduct litigation in the US for the enforcement of the MSTG patents-in-suit." The same language is used for such disparate entries as "Choose US/Japanese agents and contact individually" on February 2, 2008, (MSTG000420), and "Send attorney opinion to [litigation counsel] Niro" on February 16, 2009. (MSTG000509.)

MSTG's generic language fails to provide any meaningful information that would allow the Court to undertake a privilege analysis. Presumably, each entry addresses an individual task that is separate from the others and requires at least some differentiation in language to show how a privilege applies to each task's unique nature. For example, the "questions and analysis" relevant to contacting the "Japanese agents" mentioned above – whatever that means in this context – surely differ to some degree from what would apply to communications with MSTG's current litigation counsel; the Japanese agents, who do not represent MSTG here, were contacted eleven months before this suit was filed, and the communication with MSTG's counsel occurred six weeks after filing. MSTG's descriptions, however, make no distinctions between such different communications. Notably, MSTG has not provided copies of the documents in question for an *in camera* review, and the Court has no evidence as to what MSTG is specifically seeking to protect from discovery based on its formulaic descriptions, or even what its basis is for asserting a privilege claim. MSTG fails to allege, for example, fundamental elements of the attorney-client privilege such as what legal advice was sought, who asked for it on behalf of

MSTG, from whom it was sought, or what specific communications were made for the purpose of obtaining such advice. *See White*, 950 F.2d at 430.

MSTG's description also precludes a determination of whether the work product doctrine applies to items 1-3.[4] MSTG bears the burden of showing that "the primary motivating purpose behind the creation of a document . . . must be to aid in possible future litigation." *Binks Mfg. Co. v. Nat'l Presto Indus*., 709 F.2d 1109, 1119 (7th Cir. 1983) (internal quote and citation omitted). This court has stated that the anticipation of litigation means "a substantial and significant threat of litigation," not just the expectation that a suit is likely to be filed. *Allendale Mut. Ins. Co*., 145 F.R.D. at 87. Contrary to the Court's order, however, MSTG does not state when it decided to initiate this suit or any other patent litigation that might be relevant to its work product claim. This suit was filed on December 30, 2008, and the Court can reasonably infer that MSTG anticipated doing so at least some months prior to that point. However, the burden for demonstrating the time frame in which the work product doctrine could first arise is on MSTG, not the Court. Moreover, any speculation on this issue is impossible under these facts because MSTG does not state in its response when it obtained the rights to the patents-in-suit, thereby precluding any guess as to when it first contemplated suing AT&T for infringing them. Courts strictly construe the work product doctrine's elements, *id*., and MSTG has failed to show when the threat of litigation arose, what specific issues fall within the "questions and analysis"

---

[4] AT&T argues that the privilege cannot attach here because the work product doctrine only protects documents prepared by attorneys. (Reply at 3.) The privilege, however, applies to any representative of the client because the protection stems from the motivation behind the document, not the identity of the individual who prepared it. *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D. 316, 321 (N.D. Ill. 2008).

language it relies on, or how the documents created in light of those issues were motivated by the anticipation of litigation.

MSTG's privilege claims related to items 4-7 listed above fare no better. Items 4-5 rely on a second description MSTG uses throughout its redaction log: "Legal and technical analysis of MSTG patents, the history of prior owners entity status of patents asserted in current lawsuits[.]" MSTG fine tunes the descriptions for items 4-5 by adding the proviso that these documents involve legal advice from a patent attorney named David Quinlan. The company does not clarify what relation Quinlan, who is not one of MSTG's listed counsel, has to this case or whether Quinlan represented MSTG in relation to some other matter that could be relevant to asserting the attorney-client privilege. Nor does MSTG state what these communications covered, when they were made, or what connection they have to the documents related to items 4-5. "To determine whether communications were made primarily for the purpose of providing legal services, the court must consider the context in which they were made." *United States v. Cohn*, 303 F. Supp.2d 672, 684 (D. Md. 2003). Here, the Court has neither the context nor the contents of the communications on which the attorney-client privilege is based. The Court cannot determine, for example, whether MSTG is trying to protect the communication between itself and Quinlan or is only attempting to avoid disclosing some of the facts involved with items 4-5. For all the Court can tell, MSTG's reliance on terms such as "technical analysis" and "the history of owners entity status of patents" could be restricted to the facts related to these issues. The attorney-client privilege, however, does not extend to such facts, only to the communications involving them. *See Upjohn*, 449 U.S. at 395-96 ("A fact is one thing and a communication concerning that fact is an entirely different thing.").

Items 6-7 involve a slight variation of the same descriptive language, stating that these activities involved "legal and technical analysis of MSTG patents in suit, research of potential infringers of claims of MSTG patents in suit, prepared as part of prefiling investigation for disclosure to law firms for representation of MSTG." This language does not address the attorney-client privilege because MSTG does not allege that the "inventor related info" or the "shareholder report" that AT&T seeks were part of a communication with the company's litigation counsel.

Insofar as MSTG is claiming work product protection, the language for items 6-7 fails to distinguish between the "inventor related info" and the "shareholder report" and other documents that are also mentioned in items 6-7. Item 6, for example, includes references to documents other than the "inventor info" such as a "claim chart" and "materials for patents that are out of standard," (MSTG000479); item 7 also references a variety of documents in addition to the shareholder report, including an item enigmatically referred to as "foundation," as well as an instruction to "prepare requested material about '551 patent." (MSTG000513.) Even if MSTG's description specifically asserted the work product doctrine, MSTG fails to make any distinction between the information AT&T seeks – the shareholder report and inventor information – and the variety of other documents and information included in items 6-7. As the Court has repeatedly stressed here and in prior decisions, "[a] claim of privilege cannot be a blanket claim, but must be made and established on a document-by-document basis." *Allendale Mut. Ins. Co.*, 145 F.R.D. at 86; *see also Coltec Inds., Inc. v. Am. Motorists Ins. Co*., 197 F.R.D. 368, 371 (N.D. Ill. 2000). Here, MSTG's description of MSTG000479 and MSTG000513 fails to make any distinction between what appear to be quite varied documents, and the Court cannot

distinguish between the items AT&T requests and other items such as materials relating to the '551 patent, which may well be protected as part of the current litigation of that patent.

The Court therefore finds that MSTG's failure to file a proper and timely privilege log in this matter, together with its blanket claims of privilege, have prevented both AT&T and the Court from being able to determine what privilege is asserted for each document at issue or from assessing the validity of those privileges. This is counter to the spirit of Fed. R. Civ. P. 26(b)(5) and contravenes the Court's order. This Court has expressed its willingness in the past to find a waiver of privilege claims when a party has not complied fully with Rule 26(b)(5). *See Ritacca v. Abbott Labs*., 203 F.R.D. 332, 336 (N.D. Ill. 2001); *Wunderlich-Malec Sys., Inc. v. Eisenmann Corp*., No. 05 C 04343, 2006 WL 3370700, at *9 (N.D. Ill. 2006 Nov. 17, 2006); *see also Babych*, — F.R.D. —, 2010 WL 5128355, at *3 ("[P]arties and their counsel are cautioned that a timely and adequate privilege log is required by the federal rules, and that failure to serve an adequate privilege log may result in a waiver of any protection from discovery.").

In light of the fact that MSTG has not complied with the Court's November 22 order and has had ample opportunity to meet Rule 26(b)(5)'s requirements without doing so, the Court finds that MSTG has waived any privilege claim it has in relation to documents associated with the seven items in its redaction log that are responsive to the motion to compel. Even absent such a waiver, moreover, MSTG has failed to show how either the attorney-client privilege or the work product doctrine protects it from producing these documents. Accordingly, the Court finds that MSTG must produce within fourteen days of the entry of this order all documents it has relating to the following entries in its redaction log: (1) "proceed internal seminar regarding U.S. litigation," MSTG000478; (2) "seminar about US litigation," MSTG000479; (3) "send

marketing research to Niro," MSTG000479; (4) "ETRI small entity F-U," MSTG000492; (5) "ETRI small entity issue F-U," MSTG000507; (6) "inventor related info," MSTG000479; and, (7) the "shareholder report," MSTG000513.

Further, insofar as MSTG's business plans refer to any other documents that are relevant to AT&T's motion, MSTG has waived any privilege claim it might have asserted regarding those documents by not including them in its redaction log. In addition to items 1-7 above, therefore, MSTG must also produce any other documents referenced in its business plans that are responsive to the eight categories of information AT&T seeks: (1) technology seminar material; (2) claim letters; (3) inventor information; (4) invention reports; (5) shareholder reports; (6) a shareholder business presentation; (7) market research; and, (8) other references to the ETRI small entity issue. These documents shall also be produced within fourteen days of the entry of this order.

### C.      Settlement Negotiations

AT&T contends that during the parties' initial document production, MSTG turned over final, signed license agreements for the '551 patent, the '936 patent, and the '113 patent that it had previously entered into with other third-party licensees. MSTG objected on relevancy grounds, however, to turning over any communications it had with these licensees, including documents related to the settlement negotiations between the parties. Relying on the Federal Circuit's decision in *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010), AT&T now seeks the production of these communications, arguing that they are directly relevant to calculating damages in this case, especially the calculation of a reasonable royalty.

By statute, a patentee who has demonstrated infringement is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use of the invention by the infringer." 35 U.S.C. § 284. It is often less than clear what a reasonable royalty is, and the Federal Circuit has found that it should be calculated as a hypothetical negotiation between the patentee and the infringer based on a list of relevant factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). *See ResQNet*, 594 F.3d at 868-69. Such hypothetical negotiations are imagined to have taken place at the time when the infringement began, *Applied Med. Res. Corp. v. United States Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006), a process that the Federal Circuit itself has aptly described as involving both "fantasy and flexibility." *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988).

In *ResQNet*, the Federal Circuit considered a damages calculation that had been based on the royalties the patentee was already receiving from an existing license. It found that the district court erred in relying on such evidence because the specific license that was used did not concern the same technology that was being litigated in the current infringement case. *See ResQNet*, 594 F.3d at 869. Moreover, the Federal Circuit reiterated its long-held position that the most reliable hypothetical calculations arise out of situations that do not involve litigation since "litigation itself can skew the results of the hypothetical negotiation." *Id.* at 872 (citing precedents). Under the facts of that case, however, the most reliable agreement had, in fact, come out of a litigation context. The Federal Circuit did not directly instruct the district court to consider that agreement on remand, but it made the following statement that has since given rise to significant debate:

> On remand, the district court will have the opportunity to reconsider the reasonable royalty calculation. At that time, the district court may also consider the panoply of "events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators."

*Id*. at 872 (quoting *Fromson*, 853 F.2d at 1575).

AT&T contends that the quoted language from *ResQNet* requires the Court to order the production of MSTG's settlement negotiations. (Def's. Mot. at 6.) MSTG vigorously argues that is not the case, pointing out that *ResQNet* did not explicitly include the settlement negotiations as part of what the district court should consider on remand. (Pl's. Resp. at 10-11.) The parties' different interpretations of *ResQNet*'s impact on proving patent damages reflect a broader judicial disagreement about the case's meaning, with even courts in the Eastern District of Texas, one of the country's most active patent litigation venues, splitting on this issue. *Compare Software Tree, LLC v. Red Hat, Inc*., No. 6:09-CV-097, 2010 WL 2788202, at *4 (E.D. Tex. June 24, 2010) (refusing to compel discovery of settlement agreements), *with Tyco Healthcare Group LP v. E-Z-EM, Inc*., No. 2:07-CV-262, 2010 WL 774878, at *2 (E.D. Tex. March 2, 2010) ("*ResQNet* suggests that the underlying negotiations are relevant to the calculation of a reasonable royalty using the hypothetical negotiation damages model."). *Also compare Fenner Investments, Ltd. v. Hewlett-Packard Co*., No. 6:08-CV-273, 2010 WL 1727916, at *3 (E.D. Tex. April 28, 2010) (finding that *ResQNet* does not automatically require the admissibility of license agreements), *with Datatreasury Corp. v. Wells Fargo & Co*., No. 2:06-CV-72, 2010 WL 903259, at *1-2 (E.D. Tex. March 4, 2010) (stating that *ResQNet* "may have

changed the legal landscape regarding admissibility of litigation-related licenses" and admitting such licenses under the facts presented).[5]

Absent further clarification by the Federal Circuit, this Court finds that the most reasonable interpretation of *ResQNet* is that it does not require the discovery of settlement negotiations, although its exceptionally broad language may permit it under some circumstances. AT&T argues that *ResQNet*'s key wording – "the district court may also consider the panoply of 'events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators'" – is equivalent to a directive to consider settlement negotiations as part of calculating damages. AT&T provides no argument supporting this claim, stating only that the Federal Circuit "made clear" that settlement negotiations are relevant and discoverable. (Def's. Mot. at 6.) If *ResQNet*'s meaning were as unambiguous as AT&T contends, however, it would be difficult to understand how courts experienced in patent litigation could have reached such different interpretations of it.

Several factors suggest that a more cautious approach is warranted in deciding whether settlement negotiations are necessarily included in the Federal Circuit's language. On its face,

_____

[5] MSTG's reliance on *Software Tree* and non-patent precedents is not misplaced, but it must be construed in light of other considerations. Patent infringement damages involve issues unique to patent law and appear to be properly examined under Federal Circuit law, at least insofar as any conflict between local and Federal Circuit law exists. *Aero Prods. Int'l, Inc. v. Intex Recreation Corp*., 466 F.3d 1000, 1016 (Fed. Cir. 2006) (concluding that Federal Circuit precedent applies to infringement damages because the issue "involves a matter unique to patent law."); *see also Fiskars, Inc. v. Hunt Mfg. Co*., 279 F.3d 1378, 1381 (Fed. Cir. 2002) (stating that Federal Circuit law applies when the resolution of an issue "requires an understanding of the distinctive characteristics of patent damages law"). This rule extends to discovery that is related to substantive patent issues. *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc*., 265 F.3d 1294, 1307-08 (Fed. Cir. 2001) (applying Federal Circuit precedent to the discoverability of settlement negotiations, albeit under different facts).

*ResQNet* does not explicitly instruct courts to consider such negotiations, nor did the issues of either discoverability or negotiations arise in that case at all. *Fromson*, from which *ResQNet*'s language is largely taken, also did not directly involve settlement negotiations. *See Fromson*, 853 F.2d at 1575-76. The Court notes that the Federal Circuit has expressed a general policy disfavoring the admissibility of settlement negotiations, although that does not necessarily preclude their discoverability. *See Medtronic*, 265 F.3d at 1308 ("[W]e are mindful . . . of the policy in favor of protecting settlement negotiations from being admitted as evidence, thus serving to encourage settlements."). Moreover, even if the "events and facts that occurred thereafter" wording in *ResQNet* could be construed to include settlement negotiations, the Federal Circuit did not *require* the district court to consider them as part of its royalty calculation. It used the conditional "may" – not "must" or "shall" – and this language can be stretched, at most, to indicate that a court might do so if circumstances warranted such production as part of the "flexibility and fantasy" that the calculation of a reasonable royalty involves. *See ResQNet*, 594 F.3d at 872.

The Court need not decide at this point what the full scope of *ResQNet*'s language includes because, even if that case permits the discovery of settlement negotiations as part of calculating damages, AT&T has not shown why they should be produced here. In fact, AT&T does not clarify exactly what it wants MSTG to disclose. The motion to compel refers in general terms to "final, signed agreements" that MSTG produced to AT&T, but it does not identify those agreements, state how many are at issue, or indicate who entered into them with MSTG. In its response brief, MSTG attaches an agreement between itself and Motorola that covers the patents-in-suit. AT&T's reply brief, however, does not refer to the Motorola agreement or state

- 25 -

that AT&T wants MSTG to produce negotiations surrounding that license. Instead, AT&T's reply brief attaches as exhibits two license agreements that MSTG entered with RPX and Nokia. Again, however, the reply does not specifically state that these two licenses are the agreements that are relevant to AT&T's motion. Thus, the Court is unclear if AT&T's motion to compel encompasses the license between MSTG and Motorola or if the Motorola, RPX, and Nokia licenses constitute all, or only some, of those at issue in the instant motion.

Presuming that the RPX, Nokia, and Motorola agreements are the ones AT&T refers to, the company has not adequately shown why they are so relevant to proving damages that information concerning settlement negotiations should be produced. *ResQNet* reiterated the Federal Circuit's rule that when it calculates a reasonable royalty "the trial court must carefully tie proof of damages to the claimed invention's footprint in the market place." *Id.* at 869. Accordingly, when a patentee relies on an earlier license agreement as the basis for showing a reasonable royalty with an infringer, the first agreement must be "sufficiently comparable to the hypothetical license at issue in suit." *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1325 (Fed. Cir. 2009). It was clear in *ResQNet* that this standard was not met because the technology underlying the earlier agreement on which the district court mistakenly relied in calculating damages was unrelated to the one that was at issue. *ResQNet*, 594 F.3d at 870-71.

Here, the three license agreements present a middle ground between the facts in *ResQNet* and an ideal situation in which the patents covered by a prior license are the same as those at stake in the current royalty calculation. This case involves three patents – the '551 patent, the '936 patent, and the '113 patent. The Court's own inspection of the RPX, Nokia, and Motorola agreements shows that they cover these patents, but they also include many more that are not

part of this case, including five United States patents as well as fifteen South Korean and two Japanese patents. According to MSTG, these licenses involve the company's entire patent portfolio. Presumably, the royalties MSTG negotiated to license all of its assets would be significantly greater than what it would accept in order to license the '551, '936, and '113 patents alone.

As the party that has brought the motion to compel, AT&T bears the initial burden of showing that the information it seeks is relevant.[6] *Alexander v. F.B.I.*, 186 F.R.D. 154, 159 (D.D.C. 1999). Accordingly, it must show that the RPX, Nokia, and Motorola agreements are "sufficiently comparable" to the hypothetical license here in order to demonstrate relevance. *ResQNet*, 594 F.3d at 870-71. AT&T's only argument is that the broader agreements MSTG has already entered into could be relevant because they might pose a "ceiling" for what the reasonable royalty would be in this case. (Reply at 8.) Two problems stem from this claim. First, AT&T claims that the licenses themselves would establish this value, (*id.*), but the company admits that it already has these agreements. Under the liberal standard of Rule 26, discovery is allowed for any information that "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). AT&T, however, does not argue that the settlement negotiations would add to the information it already has based on the license agreements themselves. AT&T does not contend, for example, that the settlement negotiations

---

[6] The ultimate burden, of course, is on the objecting party to show why a discovery request is improper, *Rubin v. Islamic Republic of Iran*, 349 F. Supp.2d 1108, 1111 (N.D. Ill. 2004), and if the burden were shifted under these facts, MSTG would carry it by arguing that its prior licenses include its entire patent portfolio. Nevertheless, the initial obligation of showing relevancy falls upon the party bringing a motion to compel. *West v. Miller*, No. 05 C 4977, 2006 WL 2349988, at *2 (N.D. Ill. Aug. 11, 2006).

surrounding the licenses are necessary for establishing a maximum value for damages or that their discovery could lead to other admissible evidence that would serve this purpose. The Court could imagine that MSTG's negotiations might contain references to the royalty values of the patents-in-suit that in some way distinguish these patents from the other twenty-two included in the license agreements. AT&T, however, does not present such an argument, and in the absence of a claim that the negotiations could lead to other evidence that would be admissible at trial, AT&T has not carried its burden of showing why the settlement negotiations are relevant and discoverable under the standards of Rule 26.

Second, AT&T's colorful image of a damages "ceiling" is somewhat inverted because a reasonable royalty sets "the floor below which a damage award may not fall." *Fromson*, 853 F.2d at 1574; *see also Rite-Hite Corp. v. Kelley Co., Inc*., 56 F.3d 1538, 1544 (Fed. Cir. 1995). The standard for relevancy is admittedly broad, but to use AT&T's argument to find relevancy requires the Court to assume that damages in this case could extend from the floor a reasonable royalty ordinarily sets to the ceiling AT&T claims MSTG's prior licenses would establish. It is far from clear, however, that a royalty for the '551, '936, and '113 patents could reach the outer limit AT&T proposes. AT&T need not prove that is the case with any precision because discovery requests are granted if there is any possibility that the request could be relevant to a claim or defense. *Rubin*, 349 F. Supp.2d at 1111. Nevertheless, AT&T must make some minimal showing as to how MSTG's license agreements that include twenty-two patents that bear no relationship to this case provide a reasonable basis for determining what the "footprint in the market place" is for the '551, '936, and '113 patents. *ResQNet*, 594 F.3d at 869.

This is a low threshold requirement, but AT&T does not address it. Instead, the company cites the decision in *LG Display Co., Ltd. v. AU Optronics Corp.*, 722 F. Supp.2d 466 (D. Del. 2010). An expert in that case used a "worldwide portfolio cross-license methodology" as the basis for showing a reasonable royalty. *LG Display*, 722 F. Supp.2d at 472. The court did not explain what this method involved, but it found that it was an appropriate means of calculating damages because evidence showed that it was an accepted method in the patentee's industry for calculating value and was therefore complaint with the factors in *Georgia-Pacific*, *supra*. *Id.* ("[S]uch evidence regarding the licensing practices in the industry and among the parties should not be ignored, and is consistent with *Georgia-Pacific*[.]"). AT&T, however, has not applied *LG Display* to the facts of this case and merely cites that decision without further comment. Thus, the Court has no evidence of what practices prevail in the telecommunications industry, and AT&T does not argue that using licenses that cover twenty-two irrelevant patents complies with any of *Georgia-Pacific*'s factors. Nor has it explained what the method used in *LG Display* involved or why the procedures that such a method employs are either applicable or appropriate to MSTG's prior license agreements.

Accordingly, the Court finds that AT&T has not shown that MSTG is required to produce any conversations that surrounded any license agreement it entered with a third party concerning the patents-in-suit, and the motion to compel is denied on this issue.

## IV. Conclusion

For these reasons, the Court finds that AT&T's motion to compel is denied as it relates to the request for settlement negotiations relating to MSTG's prior license agreements. The motion

is granted insofar as it seeks MSTG's business plans described above.  MSTG shall produce the business plans in their entirety within fourteen days of the entry of this order.

The motion is also granted as it relates to the request for documents identified in the business plans.  Within fourteen days of entry of this order, MSTG shall produce all documents that relate to the following entries in its redaction log: (1) "proceed internal seminar regarding U.S. litigation," MSTG000478; (2) "seminar about US litigation," MSTG000479; (3) "send marketing research to Niro," MSTG000479; (4) "ETRI small entity F-U," MSTG000492; (5) "ETRI small entity issue F-U," MSTG000507; (6) "inventor related info," MSTG000479; and, (7) the "shareholder report," MSTG000513.   MSTG shall also produce any documents it has that relate to any entry in its weekly or yearly business plans concerning the following topics: (1) technology seminar materials; (2) claim letters; (3) inventor information; (4) invention reports; (5) shareholder reports; (6) shareholder business presentations; (7) market research; and, (8) references to the ETRI small entity issue other than the two ETRI issues specifically referred to in MSTG000492 and MSTG000507, which are compelled as described above.

**ENTER ORDER:**

**MARTIN C. ASHMAN**

**Dated:**  January 20, 2011.                                        United States Magistrate Judge